■■■ **FailSafe**
■■■ Air Safety Systems
■■■

hazard control process and for mobile containment systems. Paul Chirayath, Dr. Jerry Schentag and Ted Arts are co-inventors listed on this patent application. The company has also filed an international patent application under the Patent Cooperation Treaty that covers most of the major industrial countries, including Europe, Japan, China, South Korea, Australia and Brazil, and a patent application in India and Taiwan.

FailSafe recognizes the importance of trademarks in marketing its products. The Company intends to apply for trademark rights for the following: FASS, FASSCORP, Capture-Contain-Neutralize, and PICS.

# *MARKET OPPORTUNITY*

## POTENTIAL MARKET

The potential market for FailSafe products includes numerous opportunities not only in the traditional air safety segments but also in the new bioterrorism preparedness market.

### *Traditional Air Safety Segments*
FailSafe has strong growth potential within traditional air safety segments such as modular filtration systems, patient isolation systems, and portable air cleaners. In the modular filtration segment, specific market opportunities result from increased demand for isolated smoking areas in hospitals, office buildings, and other facilities driven by tightened regulations related to second-hand smoke and comfort considerations. The need for product protection from contamination creates demand for modular filtration systems at industrial facilities that do not have a certified clean room. A wide range of applications for portable air cleaners include back-up for a conventional clean air systems or additional protection for certain products. Newly discovered strains of antibiotic resistant bacteria drive growth health care providers' demand for improved isolation control, the market currently estimated at $1.5 billion globally.[6]

Furthermore, ongoing bioterrorism concerns create additional market opportunities for Failsafe products within these segments that are not currently addressed by traditional manufacturers. For example, there is a growing demand for isolated mail rooms, with the potential market including 100,000 post offices, more than 1 million public and private buildings, and 5,000 hospitals in the U.S. The incremental opportunities for portable air cleaners include emergency response applications and over 50% of the U.S. office workers based primarily in the cities. The threat of bioterrorism and resulting need for isolation of potentially large number of contagious patients will generate double-digit growth rates over the next several years for mobile isolation systems.[7]

### *Bioterrorism Preparedness Market*
Government funding for biological and chemical terrorism preparedness represents a substantial market opportunity for FailSafe products. Such funding accounts for a significant share of the $25 to $35 billion in annual appropriations by various government agencies such as the Center for Disease Control (CDC), Health Resources and Services Administration (HRSA), Department of Health and Human Services (DHHS), and Department of Transportation (DoT) directed to address:

- antiterrorism (plans to combat biological, chemical, or nuclear terrorism);
- emergency response (domestic preparedness and first response plans); and
- border, transportation, and coastal security.

Since the ability to control air hazards is a key

---

[6] Source: The World Market Research Centre, Business Briefing: Hospital and Engineering Facilities Management 2003.
[7] Source: "Supplemented HEPA Filter Market Research for Isolation Systems", The McIlvane Company, September 2002.

This document is proprietary and confidential.
© 2004 FailSafe Air Safety Systems Corp.

**FailSafe**
Air Safety Systems

component to biological and chemical terrorism preparedness, there is a growing demand for improved air safety systems. FailSafe products based on a new approach to air safety that incorporates three control strategies (i.e., capture, decontamination and isolation) successfully address this market need. As such, the Company is uniquely positioned to capture a meaningful share of this new market.

### KEY MARKET GROWTH DRIVERS
The air hazard control market is expected to grow substantially over the next several years based on the following factors:

- **Growing demand for improved isolation control:** with the resurgence of multi-drug resistant TB at epidemic levels worldwide and the ongoing threat of bioterrorism, the CDC and OSHA have recently issued several sweeping guidelines that mandate the use of increased isolation and containment protocols and call for new engineering controls for portable "personal HEPA isolation". In addition, legal exposure related to the spread of infectious diseases creates additional pressures for improved isolation control.

- **Increased funding for bio- and chemical terrorism preparedness:** the budgets of many government agencies (e.g., NIH, CDC, DHHS) provide for substantial incremental funding for bio- and chemical terrorism preparedness. The U.S. government is currently funding purchase of hospital equipment as part of preparation efforts to combat a potential attack (e.g., the "dirty bomb", smallpox, and anthrax). Additional grants are also available for research and development of decontamination equipment. The bioterrorism market is expected to grow exponentially over the next two to five years.

- **Cost savings for medical providers:** incremental cost savings resulting from deployment of portable isolation systems will generate additional market growth. To meet requirements for isolation beds, hospitals currently use traditional isolation rooms estimated to cost $60,000 to $80,000 per room for construction with additional costs incurred for maintenance. Portable isolation solutions allow medical providers to save up to 50% of purchasing and 80% to 90% of maintenance costs.

### TARGET CUSTOMERS
FailSafe products have a variety of applications ranging from patient isolation to first responders/triage to toxic mold cleanup. The Company's selected target customers by market[a] are summarized below:

| Target Customers | Private/ Medical | Public & Govt | Educational MRO / Industrial |
|---|---|---|---|
| Bldg. maintenance | X | X | X |
| Corporate offices | X | | |
| Corrections facilities | | X | |
| Dr. offices | X | | X |
| EMS | X | X | X |
| Health care clinics | | X | |
| Home health care | X | | |
| Homeless shelters | | X | |
| Hospice | X | | X |
| Hospitals | X | X | X |
| Immigration detainment facilities | | X | |
| Med. examiners' offices | | X | |
| Medical transportation | X | | |
| Military hospitals | | X | |
| Nursing homes | X | | |
| Research facilities | X | X | X |
| Restaurants | | | X |
| Schools and universities | | | X |
| Smoking areas in offices, & facilities | X | X | X |

---

[a] Source: OSHA Regulatory markets, Company analyses.

This document is proprietary and confidential.    14
© 2004 FailSafe Air Safety Systems Corp.

**FailSafe**
Air Safety Systems

# KEY MANAGEMENT

### Paul J. Chirayath, CEO
Mr. Chirayath combines more than 15 years of experience in the software design and implementation industry with an entrepreneurial management style as the leader of FailSafe. His most recent accomplishments include the founding, growth and eventual sale of Latpon Corporation to Welsh, Carson, Anderson and Stowe. Renamed MedE America and now Healtheon WebMD, it employs thousands of people nationwide and is the largest healthcare data switch in the country.

Mr. Chirayath has also co-founded Network Security Corporation (NSEC) and served in the capacity of V.P. and C.O.O., and was later elected President and CEO. Under his direction, NSEC's run rate grew from $0 to $12 million during a four-year period. NSEC was one of only a few technology companies in the late '90's to remain profitable and cash flow positive - doing so for 16 straight quarters.

### ADVISORY GROUP:

### Pamela Campagna, Principal
### Blue Sage Consulting, Inc.
For 20 years, Pamela has held a variety of sales, marketing, product management, business development and operations positions in successful global high tech and software companies. Pamela has worked with product teams to define, develop and market a variety of software products, build sales operations teams, manage projects and develop business opportunities through acquisition.

Since 1997, Blue Sage Consulting has worked with a variety of business-to-business clients in the software, telecommunications, construction, health care and consulting services segments. Pamela holds an undergraduate degree from the State University of New York at Albany, and an M.B.A. in International Business from The American University in Washington, DC. Blue Sage Consulting handles FailSafe's channel sales, marketing and public relations.

### Donald B. Flanagan, President and CEO
### Brandon Associates, LLC
Donald Flanagan is the founder and President of Brandon Associates, LLC, the largest independent public affairs and issues management firm in Massachusetts. Don is legislative counsel to some of the largest interests in corporate America, and provides clients with comprehensive, hands-on representation at the federal level and among the states. A former Advisor and Legislative Aide to Governor Edward J. King, Don served for seven years as the Executive Vice President and Chief Lobbyist of the largest life and health insurance trade association in the Northeast.

Don is actively involved in representing FailSafe in every facet of legislative, executive and administrative process, providing day-to-day strategic advice and counsel on a number of state, local and national issues.

### Alan Feuerstein, Partner
### Feuerstein & Smith, LLP
During his 30-year career, Alan has practiced and taught law across a variety of specialty areas, including Personal Injury, Medical Malpractice, Products Liability, Commercial Law, Corporate Law, Finance, Real Property Development and White Collar Criminal Defense. Currently a partner of Feuerstein & Smith, LLP, Alan is a member of more than a dozen legal and bar associations, including the American Bar Association and the Virgin Islands Bar Association. Alan has also been admitted to practice in more than a dozen United States District Courts, Circuit Court of Appeals, Bankruptcy Court and the Appellate Division of the Supreme Court of the State of New York. Alan received his Doctor of Jurisprudence from the University of Toledo College of Law and his Bachelor of Arts degree, Cum Laude, from the State University of New York at Buffalo.

This document is proprietary and confidential.
© 2004 FailSafe Air Safety Systems Corp.



Alan advises FailSafe on a wide range of legal matters.

### *Eliot S. Lazar, MS, MD, President*
### *eICON Medical Consulting*

Dr. Lazar is the principal of eICON Medical, a Buffalo, NY-based consultancy that provides a unique end-user medical/surgical perspective on medical device market needs and requirements, medical technology trends and developments, and funding strategies. The company collaborates with medical device and pharmaceutical companies on product design and provides due diligence for venture capitalists and other financial interests. An ophthalmologist specializing in anterior segment pathology and surgery, Lazar has several university appointments. He holds patents on intraretinal delivery and withdrawal instruments, has published numerous articles, and regularly presents research findings at medical society meetings. Professional memberships include the American Medical Association, International Society of Refractive Surgery, the Society for Neuroscience, International Society of Eye Research, and the Regulatory Affairs Professionals Society. Lazar has a BA degree from the University of Pennsylvania, an MS from the State University of New York at Buffalo, and an MD from Georgetown University.

EICON provides FailSafe with strategic consulting on medical applications of the Company's products.

This document is proprietary and confidential.
© 2004 FailSafe Air Safety Systems Corp.

Patent
Attorney Docket: 21562-1003

# ASSIGNMENT OF PATENT APPLICATION

WHEREAS, PAUL J. CHIRAYATH (hereinafter referred to as "ASSIGNOR"), a citizen of the UNITED STATES OF AMERICA, is a joint inventor of AIR DECONTAMINATION DEVICES, for which an application for Letters Patent of the United States of America was filed on May 8, 2003 and was assigned Application Number 10/434,041; and

WHEREAS, Failsafe Air Safety Systems Corporation (hereinafter referred to as "ASSIGNEE"), a Delaware Corporation, is desirous of acquiring the exclusive right, title and interest in, to and under said invention, said application and any Patent or similar legal protection to be obtained therefor in the United States of America, its possessions and territories and in any and all other countries in the world.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, ASSIGNOR hereby sells, assigns, transfers and sets over unto the said ASSIGNEE, its successors and assigns, the full and exclusive right, title and interest in, to and under said invention, said application and all Letters Patent or similar legal protection, in the United States of America, its territories and possessions, and in any and all other countries in the world, to be obtained for said invention by said application, and to any continuation, division, renewal, substitute or reissue thereof or any legal equivalent thereof in the United States of America or another country or regional group for the full term or terms for which the same may be granted, including all priority rights under the International Convention; and ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks to issue said Letters Patent or any legal equivalent thereof to said ASSIGNEE, its successors and assigns, in accordance with this Assignment.

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this Agreement;

ASSIGNOR further covenants that ASSIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to said applications, said invention and said Letters Patent and legal equivalents as may be known and accessible to ASSIGNOR and will testify as to the same in any interference or litigation related thereto and will promptly execute and deliver to ASSIGNEE or its legal representative any and all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce said application, said invention and said Letters Patent and said equivalents in the United States or in any and all other countries, which may be necessary or desirable to carry out the purposes thereof.

30701804.DOC

Patent<br>Attorney Docket: 21562-1003

WITNESS my hand at this 4TH day of _____NOV._____, 2003.

_____
Paul J. Chirayath

STATE OF __NY__ )
COUNTY OF __ERIE__ ) ss
               )

On __11/4/03__ before me, Paul J. Chirayath personally appeared,

_____

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said County and State

PATRICIA R. McLEAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
My Commission Expires __3/30/07__

30701804.DOC

Patent
Attorney Docket: 21562-1003

# ASSIGNMENT OF PATENT APPLICATION

WHEREAS, JEROME SCHENTAG (hereinafter referred to as "ASSIGNOR"), a citizen of the UNITED STATES OF AMERICA, is a joint inventor of AIR DECONTAMINATION DEVICES, for which an application for Letters Patent of the United States of America was filed on May 8, 2003 and was assigned Application Number 10/434,041; and

WHEREAS, Failsafe Air Safety Systems Corporation (hereinafter referred to as "ASSIGNEE"), a Delaware Corporation, is desirous of acquiring the exclusive right, title and interest in, to and under said invention, said application and any Patent or similar legal protection to be obtained therefor in the United States of America, its possessions and territories, and in any and all countries in the world.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, ASSIGNOR hereby assigns, sells, transfers and sets over unto the said ASSIGNEE, its successors and assigns, the full and exclusive right, title and interest in, to and under said invention, said application and all Letters Patent or similar legal protection, in the United States of America, its possessions and territories, and in any and all countries in the world, to be obtained for said invention by said application, and to any continuation, division, renewal, substitute or reissue thereof or any legal equivalent thereof in the United States of America or another foreign country or regional group for the full term or terms for which the same may be granted, including all priority rights under the International Convention; and ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks to issue said Letters Patent or any legal equivalent thereof to said ASSIGNEE, its successors and assigns, in accordance with this Assignment.

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this Agreement;

ASSIGNOR further covenants that ASSIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to said applications, said invention and said Letters Patent and legal equivalents as may be known and accessible to ASSIGNOR and will testify as to the same in any interference or litigation related thereto and will promptly execute and deliver to ASSIGNEE or its legal representative any and all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce said application, said invention and said Letters Patent and said equivalents in the United States or in any and all other countries, which may be necessary or desirable to carry out the purposes thereof.

Patent
Attorney Docket: 21562-1003

WITNESS my hand at this 4tH day of NOV _____, 2003.

_____
Jerome Schentag

STATE OF N.Y.        )
                     ) ss
COUNTY OF ERIE       )

On 11/04/03 before me, Jerome Schentag personally appeared,

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.          Patricia R McLean
                                    _____
                                    Notary Public in and for said County and State

PATRICIA R. McLEAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
My Commission Expires 3/30/07

30701807.DOC

Patent
Attorney Docket: 21562-1003

## ASSIGNMENT OF PATENT APPLICATION

WHEREAS, Failsafe Air Safety Systems Corporation, a Delaware corporation (hereinafter referred to as "ASSIGNOR"), is an assignee of AIR DECONTAMINATION DEVICES, for which an application for Letters Patent of the United States of America was filed on May 8, 2003 and was assigned Application Number 10/434,041; and

WHEREAS, THEODORE A. M. ARTS (hereinafter referred to as "ASSIGNEE"), a citizen of CANADA residing at 312 Countryside Lane, Williamsville, New York 14211, a joint inventor of said AIR DECONTAMINATION DEVICES, is desirous of acquiring the exclusive right, title and interest in, to and under said invention, said application and any Patent or similar legal protection to be obtained therefor in the United States of America, its possessions and territories and in any and all other countries in the world.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, ASSIGNOR hereby assigns to the said ASSIGNEE, the exclusive right, title and interest in, to and under said invention, said application and all Letters Patent or similar legal protection, in the United States of America, its possessions and territories, and in any and all other countries in the world, to be obtained for said invention by said application, and to any continuation, division, renewal, substitute or reissue thereof or any legal equivalent thereof in the United States of America, its possessions and territories, or another country, for the full term or terms for which the same may be granted, including all priority rights under the International Convention; and ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks to issue said Letters Patent or any legal equivalent thereof to said ASSIGNEE, its successors and assigns, in accordance with this Assignment.

This Assignment is revocable by the Assignor with respect to the United States of America, its possessions and territories, but is not revocable with respect to all other countries in the world. This Assignment is non-transferable.

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this Agreement;

ASSIGNOR further covenants that ASSIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to said applications, said invention and said Letters Patent and legal equivalents as may be known and accessible to ASSIGNOR and will testify as to the same in any interference or litigation related thereto and will promptly execute and deliver to ASSIGNEE or its legal representative any and all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce said application, said invention and said Letters Patent and said equivalents in the United States or in any other country or regional group, which may be necessary or desirable to carry out the purposes thereof.

30701838.DOC

Patent
Attorney Docket: 21562-1003

WITNESS my hand at this __4TH__ day of __NOV·_____, 2003.

_____
Paul J. Chirayath, Chief Executive Officer
Failsafe Air Safety Systems Corporation

STATE OF __NY__ )
                ) ss
COUNTY OF __ERIE__ )

On __11/4/03__ before me, Paul J. Chirayath personally appeared,

☐ personally known to me - **OR** - ☐ proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said County and State


PATRICIA R. McLEAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
My Commission Expires __3/30/07__

30701838.DOC

# Exhibit "E"

## ASSIGNMENT OF PATENT INTERESTS

1. I, James M. Thomsen Sr., an individual residing at 37 Finger Street, Saugerties, NY, 12477 ("Assignor"), for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged according to Exhibit B, do hereby grant, transfer, convey and assign to Theodore A. M. Arts, with a mailing address at 312 Countryside Lane, Williamsville, NY 14221 its successors and assigns, all right, title, and interest in and to all work and materials relating to my Patent identified as "Air Filtration Products listed in Exhibit A", including the copyright, patent, trade secret rights, and all other right, title, and interest therein, and consisting of all existing devices, documentation, design documents, and records relating thereto, and all trademarks, service marks, logos and trade dress associated therewith, if any, (collectively the "Works"). This exclusive conveyance shall include, but is not limited to, the rights to, sell, manufacture, distribute, publish, reproduce, transmit, adapt, prepare derivative works, sell, or otherwise make use of the Works (including all subsequent additions, revisions, supplements to, and versions of the Works and derivatives, regardless of length or nature) throughout the world, in any form or medium and in any language, and to license or otherwise transfer to others the rights commensurate herewith in connection with the Works.

2. I have not granted any license to use any of the Works, including patents or devices, to anyone else that is not recoverable. All such licenses, if any, are hereby assigned to Theodore A. M. Arts for his disposition.

3. I hereby grant to Theodore A. M. Arts, its successors and assigns, the right to file copyright and patent applications in the United States and throughout the world for the Works in my name, or his and our successors and assigns. I hereby agree that Theodore A. M. Arts, it successors and assigns may act as attorney-in-fact to execute any document that Assignee, its successors and assigns.

deem necessary to record this grant with the United States Copyright office or elsewhere as long as copies are provided to James Thomsen for review of accuracy before submittal. If requested, I agree to execute any and all copyright, patent, or trade secret assignments, certificates, applications or documents requested by Company, its successors and assigns according to the terms of Exhibit B. The cost of recording and registering ownership rights in the Works shall be borne solely by Theodore A. M. Arts, its successors and assigns.

James M. Thomsen
Date: 5/28/02

PATRICIA R. McLEAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
My Commission Expires 9/30/03

On this 28TH of MAY 2002, before me personally appeared James M. Thomsen, to me known to be the person described in and who executed the foregoing instrument and acknowledged that James M. Thomsen executed the same as his free act and deed.

Notary Public

PATRICIA R. McLEAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
My Commission Expires 9/30/03

## EXHIBIT A

Ideas, Patents, Devices and Inventions Covered by this assignment. Unless specifically noted below, other ideas, products, devices, work, and material is not covered in the assignment.

## MEDICAL TB AND INFECTION CONTROL UNITS:

*In production:*

A-1 Medical Model 77 Bed Isolation Unit
A-2 Medical Model 17 Wheel Chair Isolation Unit
A-3 Medical Model 07 Portable Transport Battery Run Unit

*Not in Production*

A-4 Medical Model OTG – Portable suitcase sized Isolation for patient transport
A-5 Medical Model LS77 – Positive Aseptic Flow Unit

## FAILSAFE AIR SAFETY SYSTEM

*In Production:*

B1   750 Model
B2   1000 Model
B3   2000 Model

*Not in Production.*

C-1 Corrections Wall Mounted Unit – prototype only

# AMENDED AND RESTATED INTERNATIONAL LICENSE AGREEMENT

THIS AMENDED AND RESTATED INTERNATIONAL LICENSE AGREEMENT ("Agreement") is made and entered into as of September ___, 2003 (the "Effective Date") by and between Theodore A. M. Arts, an individual residing at 312 Countryside Lane, Williamsville, New York 14221 ("Licensor"), and Failsafe Air Safety Systems Corp., a Delaware corporation having a place of business at 79 Fillmore Avenue, Tonawanda, New York 14150 ("Licensee") (each, a "Party" and together, the "Parties").

WHEREAS, Licensor owns the Licensed Technology as defined below;

WHEREAS, Licensor has Licensed (as defined below) the Licensed Technology to Licensee pursuant to the Existing License (as defined below); and

WHEREAS, Licensor and Licensee wish to clarify and amend the terms and conditions of the License provided pursuant to the Existing License, to include certain additional terms and provisions by entering into this Agreement, and to have the Existing License be superseded in its entirety by this Agreement;

NOW, THEREFORE, in consideration of the payments made and to be made to Licensor by Licensee and the mutual promises and covenants contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. **Definitions.**

As used in this Agreement, terms with initial capitalization shall have the meanings below:

1.1 "Affiliate" and "Affiliates" mean any individual, corporation, subsidiary, affiliate, partnership, association, business, organization or other entity that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a Party and/or such entities. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of an individual or entity, whether through the ownership of voting shares, by contract or otherwise.

1.2 "Agreement" has the meaning set forth in the preface to this Agreement.

1.3 "Bankruptcy Code" means the Bankruptcy Code of the United States, as amended.

1.4 "Bankruptcy Event" means, with respect to any Person, that: (a) such Person shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing; or (b) an involuntary case or other proceeding shall be commenced against such Person seeking liquidation, reorganization or

other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days, or an order for relief shall be entered against it under the Bankruptcy Code.

1.5 "Calendar Quarter" means each of the three-month periods ending March 31, June 30, September 30 and December 31 in any given calendar year.

1.6 "Effective Date" has the meaning set forth in the preface to this Agreement.

1.7 "Existing License" means the International License Agreement dated as of September 25, 2002 between Licensor and Licensee.

1.8 "Force Majeure Event" has the meaning set forth in **Section 12.12**.

1.9 "Intellectual Property Right" and "Intellectual Property Rights" mean (a) all rights under all copyright laws of the United States and all other countries for the full terms thereof (or all rights accruing by virtue of copyright treaties and conventions), including, but not limited to, all renewals, extensions, reversions or restorations of copyrights now or hereafter provided by law and all rights to make applications for and obtain copyright registrations therefor and recordations thereof; (b) all Patent Rights (c) all trade secrets; (d) all trademarks, service marks and Internet domain names and the like and the goodwill associated therewith throughout the World; and (e) all other intellectual and industrial property and proprietary rights throughout the Universe not otherwise included in the foregoing, including, without limitation, all know-how (not otherwise included in subsection "(b)"), techniques, methodologies and concepts and trade dress.

1.10 "License" or "Licensed" has the meaning set forth in **Section 3.1**.

1.11 "Licensed Patent" and "Licensed Patents" mean all Patent Rights which cover all or any part of any of the Products, including, without limitation, the patents, patent applications, and invention disclosures and improvements set forth in **Exhibit A** and all inventions and improvements that Licensor may invent in whole or in part or own in whole or in part or file (or have filed on his behalf) during the Term hereof with respect to the Products, air filtration and/or decontamination.

1.12 "Licensed Technology" means the Licensed Patents and all technology or improvements (including, but not limited to, any Patents Rights applicable to any such technology or improvements thereof in whole or in part) developed by Licensor in connection with, related to, arising from, used in the making of and/or embodied in the Products (including, but not limited to, all modifications, additions, enhancements and improvements of any kind to the Licensed Patents and such technology) and all other Intellectual Property Rights owned by or licensed to Licensor and associated with the Licensed Patents or such technology or improvements during the Term of the Agreement.

1.13 "Licensee" has the meaning set forth in the preface to this Agreement.

1.14 "Licensee Indemnified Parties" has the meaning set forth in **Section 9.1**.

1.15 "Licensor" has the meaning set forth in the preface to this Agreement.

1.16 "Licensor Indemnified Parties" has the meaning set forth in **Section 9.2**.

1.17   "Losses" means and includes, but shall not be limited to, losses, liabilities, claims, damages, costs (including, without limitation, the reasonable costs incurred in the enforcement of any indemnification obligations, or taxes), reasonable legal fees (including reasonable attorneys' fees and disbursements and costs of investigation, litigation and settlement), liabilities, penalties and expenses incurred by the applicable Person.

1.18   "Merchandising Rights" has the meaning set forth in **Section 3.3**.

1.19   "Net Invoice Price" means the gross sales price (or net revenues, in the case of Merchandising Rights) actually invoiced by Licensee for Products sold or Merchandising Rights granted, as the case may be, by Licensee, less all returns, credits, freight and taxes (and any agent's fees, expenses and commissions, if any, in the case of Merchandising Rights) of such gross sales price (or net revenues, in the case of Merchandising Rights), provided however, that any contract sale with a payment term of greater than sixty (60) days shall be treated as a sale for the total contract amount in the calendar month which is sixty (60) days from the date of first invoice (this includes, but is not limited to, leases, conditional contract sales and rentals).

1.20   "Party" and "Parties" have the meaning set forth in the preface to this Agreement.

1.21   "Patent Rights" mean all rights to and under new and useful inventions, discoveries, designs, technology and art and all other patentable subject matter, and all applications for and all Letters Patent that issue therefrom in all countries of the world and all reissues, extensions, renewals, divisional applications and continuations (including continuations-in-part) thereof together with all know-how owned, created and/or developed by Licensor in whole or in part.

1.22   "Person" means any individual, governmental authority, corporation, limited liability company, partnership, trust or other entity.

1.23   "Product" and "Products" means those products set forth on **Exhibit B**.

1.24   "Robinson-Patman Act" means the Robinson-Patman Antidiscrimination Act, as amended.

1.25   "Royalty Fee" and "Royalty Fees" mean the fees paid to Licensor by Licensee for the License.

1.26   "Term" has the meaning set forth in **Section 7.1**.

1.27   "Third Party" and "Third Parties" mean one or more persons or entities other than Licensor, Licensee or their respective Affiliates.

1.28   "United States" means the United States of America and its possessions and territories.

1.29   "Work Product" means each and every invention, modification, enhancement, work of authorship, addition and improvement to a Product or the Licensed Technology.

2.   **Existing License and Continuation of Rights.**

2.1   The Existing License is hereby superseded and replaced in its entirety by this Agreement. Notwithstanding anything in this Agreement to the contrary, rights and obligations that have in accordance with the terms of this Agreement accrued under the Existing License as of the Effective Date

of this Agreement shall continue in effect after the Effective Date of this Agreement, except as otherwise specifically set out in this Agreement.

3. **Exclusive License.**

3.1   Licensor hereby grants to Licensee an exclusive, irrevocable, worldwide license (the "License") to make, have made, use, sell, import and sublicense the Licensed Technology (including, but not limited to, for the purposes of manufacturing, assembling, distributing, leasing, renting and selling the Products and sublicensing or subcontracting the manufacture, assembly, distribution and sale of the Products).

3.2   All rights and licenses granted under or pursuant to Section 3.1 of this Agreement by Licensor to Licensee are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code, licenses to rights to "intellectual property" as defined in the Bankruptcy Code. The Parties agree that Licensee, as the licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code. The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against Licensor under the Bankruptcy Code, Licensee shall be entitled to retain all of its rights under Section 3.1 of this Agreement.

3.3   The Licensee may exploit, or may designate an agent or agents of its selection to exploit, or to assist in exploiting, all rights in and to the Licensed Technology and the Products (including, but not limited to, book, television, cable, disc, videocassette, clothing and film rights and all other related media rights). The Licensee will pay to the Licensor a Royalty Fee from the exploitation of these merchandising rights (the "Merchandising Rights") in accordance with Section 4, after deduction of any agent's fees, expenses and commissions, if any.

4. **Royalties and Fees.**

4.1   (a)   Except as otherwise provided in this Agreement, Licensee shall pay to Licensor a Royalty Fee equal to ten percent (10)% of the Net Invoice Price of all Products sold and Merchandising Rights granted by Licensee during the Term. For the avoidance of doubt, a Royalty Fee shall be paid for either a Product sold or a Merchandising Right granted, but not both, for a maximum Royalty Fee of ten percent (10%). Upon any sublicensing or subcontracting of the manufacture and assembly, together with the distribution and/or sale of the Products by Licensee, Licensee shall pay to Licensor a fee equal to fifty percent (50%) of the sublicensing fees actually received by it in connection with such sales. The Royalty Fee (or discounted in the case of conditional contract sales and rentals) based upon invoiced sales will be paid to Licensor monthly, within sixty (60) days after the end of each calendar month until such time that the Licensee reaches five million dollars ($5,000,000.00) in annual sales volume at which time Royalties will be paid to Licensor quarterly within thirty (30) days after the end of each Calendar Quarter.

(b)   Licensee will pay a one-time fee of one hundred thousand dollars ($100,000.00) payable at a minimum rate of twenty-four (24) equal payments which payments began thirty (30) days after signing the Existing License, of which forty-five thousand seven hundred ninety-eight dollars and sixty cents ($45,798.60) has been paid as of the Effective Date, with a balance remaining to be paid of fifty-four thousand two hundred one dollars and forty cents ($54,201.40).

4.2   Royalty Fees payments will be accompanied by account statements certified as accurate and complete by Licensee for each Calendar Quarter setting forth the amount of invoiced sales, payments received and credits in the aggregate and separately for each Product by serial number to the extent possible. Late payments of royalties will bear interest at the rate of one and eight-tenths percent (1.8%) per month. Notwithstanding the immediately preceding sentence, if Licensor has not received any

Royalty Fees payment within thirty (30) days of the date it is due and payable, Licensor may serve Licensee notice providing Licensee thirty (30) days to correct such payment deficiency or be considered in breach of this Agreement.

5.   **Intellectual Property Rights.**

5.1   Licensee shall have the first right to file patent applications for patents in the United States of America and may, in its sole discretion, do so (in the name and on behalf of Licensor) at Licensee's sole cost and expense. Licensor shall cooperate with Licensee and timely provide to Licensee all reasonably necessary assistance requested by Licensee in connection with any such applications. Licensee, upon request by Licensor from time to time, shall keep Licensor apprised of the status of all such applications, any pending patent applications and patents issued therefrom. If Licensee elects not to file and/or prosecute any such patent applications, Licensor may do so at Licensor's sole cost and expense. Licensor, upon request by Licensee from time to time, shall keep Licensee apprised of the status of all patent applications, if any, filed by Licensor relating to the Licensed Technology or the Products and shall promptly provide Licensee with copies of any pending patent applications and patents issued therefrom.

5.2   Licensee shall have the first right to file patent applications for patents in countries other than the United States (including, without limitation, through the Patent Cooperation Treaty and/or the European Patent Office) and may, in its sole discretion, do so (in the name and on behalf of Licensor) at Licensee's sole cost and expense. Licensor shall cooperate with Licensee and timely provide to Licensee all reasonably necessary assistance requested by Licensee in connection with any such applications. Licensee, upon request by Licensor from time to time, shall keep Licensor apprised of the status of all such patent applications, if any, filed by Licensee and shall promptly provide Licensor, upon request, with copies of any pending patent applications and patents issued therefrom. If Licensee elects not to file and/or prosecute any such patent application, Licensor may do so at Licensor's sole cost and expense. Licensor, upon request by Licensee from time to time, shall keep Licensee apprised of the status of all such patent applications, if any, filed by Licensor relating to Licensed Technology or the Products and shall promptly provide Licensee with copies of any pending patent applications and patents issued.

5.3   Licensor hereby agrees that it will offer Licensee a license to all future patents issued to Licensor relating to the Licensed Technology or the Products (and at the Effective Date not filed for or in any stage of the process of being filed for, or otherwise based on the Licensed Technology existing as of the Effective Date) consistent with the terms set forth in Section 3.1 hereof, with a right of first refusal. Licensor hereby agrees to make such offer no later than five (5) days after the date each such patent has been allowed by the applicable government patent office. The right of first refusal period shall be sixty (60) days from the date the offer is extended to Licensee in writing. In the event that Licensee refuses to exercise such right with respect to any such patent, Licensor will have the right to license any other party or parties to such future patent refused by Licensee, subject to a further right of Licensee to match in all material terms (within a period not to exceed thirty (30) days from Licensee's receipt of notice thereof from Licensor) any bona fide, Third Party offer to license any such patent, and, in which case, if Licensee exercises such right, the license shall be granted by Licensor to Licensee as a Licensed Patent.

5.4   Subject to the provisions of this Agreement, all Work Product created by Licensor will be the sole and exclusive property of Licensor and shall be deemed to be Licensed Technology. All Work Product created by Licensee will be the sole and exclusive property of Licensee. All Work Product jointly developed by the Parties will be jointly owned, including, without limitation, all Intellectual Property Rights therein or related thereto. To the extent that ownership of such Licensee Work Product (including, but not limited to, Licensee's joint interest in jointly owned Work Product) does not vest in Licensee as a work made for hire or otherwise by operation of law, Licensor agrees to and hereby does