irrevocably assign, sell, convey and transfer all (or, in the case of jointly owned Work Product, Licensee's joint interest therein) of his worldwide rights therein (including, without limitation, all Intellectual Property Rights and industrial property rights therein) to Licensee in exchange for the consideration to be paid by Licensee pursuant to the terms hereof. To the extent applicable law requires that any Work Product developed by Licensee belongs to Licensor, rather than Licensee, notwithstanding the immediately preceding sentence, Licensor grants to Licensee an exclusive, perpetual and transferable license to make, have made, import, distribute, lease, rent, sell, amend, copy, exploit, sublicense and use all such Work Product, in its sole discretion, for no consideration other than that which is received by Licensor in connection with this Agreement.

5.5    Subject to the provisions of **Section 7.4**, Licensee hereby agrees to and hereby does assign, Licensee's joint interest (as described above) in its worldwide rights in jointly owned Work Product (including, without limitation, all Intellectual Property Rights and industrial property rights therein) to Licensor.

5.6    Each Party agrees to cooperate with the other Party and execute all documents and filings and take all steps reasonably necessary and requested by the other Party in government offices and otherwise in a timely fashion in order to perfect or confirm the assignment, transfer or vesting of the Intellectual Property Rights in the other Party contemplated hereunder.

6.    **Non-Competition.**

6.1    During the Term, Licensor shall not be employed by, render services to, represent or otherwise be affiliated with any Person in connection with any product or service directly or indirectly competitive with or similar to any Product or the Licensed Technology.

6.2    During the Term, Licensee shall not manufacture, assemble, distribute or sell any product (other than Products) that infringe the Licensed Patents. Licensee will adhere at all times to the Robinson-Patman Act regarding resale of Products.

7.    **Term and Termination.**

7.1    Term. The term commenced on September 25, 2002 and will continue until the latest expiration date of any Licensed Patent, unless earlier terminated as expressly provided in this Agreement (the "Term").

7.2    Licensor Termination. Licensor may terminate this Agreement as follows:

(a)    upon Licensee's material breach of this Agreement that is not remedied within thirty (30) days after Licensee's receipt of notice of such breach;

(b)    upon thirty (30) days' notice to Licensee if Licensee does not manufacture and sell Products for any consecutive three (3) month period, except in the case of a Force Majeure Event; or if Licensee has not sold at least five hundred thousand dollars ($500,000.00) in aggregate sales by December 2003;

(c)    in the event that a Bankruptcy Event occurs with respect to Licensee; or

(d)    if within thirty (30) days after the end of the calendar year 2004, Licensee has not paid to Licensor Royalty Fees of at least one hundred thousand dollars ($100,000.00), and if within thirty (30) days after the end of calendar year 2005, Licensee

has not paid to Licensor Royalty Fees of at least $200,000.00, with future years' minimum Royalty Fees to be determined annually by mutual consent with its basis in the forecasted Product sales used by Licensee in its corporate pro forma projections, which forecast for calendar year 2006 shall be made in December 2005 and which forecast for subsequent years shall be made in December of each succeeding year for the following year; provided, however, that Licensee, in its sole discretion, may make a cash payment to Licensor of the amount of any such shortfall. In the event that the Parties cannot agree to a minimum annual Royalty Fee, then the preceding year's fee will be used as a minimum, provided, however, that no unusually large one time sales have been made (i.e. one time purchase by the military) that would unreasonably skew that year's sales numbers.

7.3     Licensee Termination. Licensee may terminate this Agreement as follows:

         (a)     in the event that a Bankruptcy Event occurs with respect to Licensor; or

         (b)     if Licensee acquires the Licensed Patents.

7.4     Effect of Termination.

         (a)     Upon termination of this Agreement by either Party, all rights granted to Licensee under this Agreement will revert to Licensor free and clear of any lien, security interest or other encumbrance, and Licensee and its Affiliates and sublicensees shall immediately cease the manufacture, assembly, distribution, sale, promotion, advertising and marketing of Products; provided, however, Licensee shall have the right to continue to market and sell existing Products in inventory as of the date of termination for a reasonable period following such termination.

         (b)     Upon termination of this Agreement by either Party, all Royalty Fees due and payable in accordance with the terms of this Agreement must be paid to Licensor in accordance with the terms hereof.

         (c)     Upon termination of this Agreement by either Party, the assignment of Licensee's joint interest in its worldwide rights in jointly owned Work Product (as effected by Section 5.5) shall immediately and without the necessity of action by either Party be revoked with respect to all such rights (including, but not limited to, all modifications, additions, enhancements and improvements of any kind to such Work Product, and further including, but not limited to, all Patent Rights) in the United States, and as of such termination, such Work Product shall again be jointly owned. To the extent that such ownership of such Work Product does not vest in Licensee *ipso facto* by virtue of such revocation, Licensor agrees to and hereby does, as of such termination, irrevocably assign, such Work Product (including, without limitation, all Intellectual Property Rights and industrial property rights therein) to Licensee in exchange for the consideration to be paid by Licensee pursuant to the terms hereof. Licensor agrees to cooperate with Licensee and execute all documents and filings and take all steps reasonably necessary as may be requested by Licensee in government offices and otherwise in a timely fashion in order to perfect or confirm such revocation and the assignment, transfer or vesting of the Intellectual Property Rights in Licensee contemplated hereunder. With respect to U.S. Patent Application Number 10/434,041, filed on May 8, 2003, the Work Product of the Licensee includes, but is not limited to,

the placement of a source of ultraviolet radiation at least partially within a boundary defined by a V-shaped region of a V-bank filter in an air decontamination device.

(d)   Sections 1, 8, 9, 10, 11 and 12 shall survive any termination or expiration of this Agreement.

8.  **Representations, Warranties and Covenants.**

8.1   Representations, Warranties and Covenants of Licensor. The Licensor represents and warrants to the Licensee that: (a) he owns the Licensed Technology and has the power to grant the License to the Licensee; (b) he has not granted to any other Person a license of the Licensed Technology; (c) through his best efforts and with the assistance of professional counsel, it is his belief that the Licensed Technology does not infringe any patent, copyright, trademark or other proprietary right of any third party and (d) this Agreement constitutes the legal, valid and binding obligation of the Licensor enforceable against him in accordance with its terms.

8.2   Representations, Warranties and Covenants of Licensee. Licensee represents, warrants and covenants to Licensor, as an essential part of the Agreement, that: (a) it is duly organized and validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation; (b) it has full corporate power and authority to execute and deliver this Agreement and perform its obligations hereunder and to grant the rights granted and intended to be granted hereunder; (c) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms; (d) the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant hereto, and the consummation of the transactions contemplated hereby, do not and shall not (i) conflict with or result in a breach of any provision of its organizational documents; (ii) result in a breach of any agreement to which it is a party; or (iii) violate any law expressly required by this Agreement to be complied with or, to its knowledge, violate any other law; (e) there is no pending litigation, arbitration or other similar proceeding before any tribunal involving a claim of infringement or violation of any of its Intellectual Property Rights or other rights which if adjudicated against it would interfere with its ability to discharge its obligations hereunder or grant the rights intended to be granted to Licensor hereunder; and (f) it shall comply with all laws, rules and regulations to the extent applicable to its performance hereunder.

9.  **Indemnification.**

9.1   Licensor shall indemnify, defend and hold harmless Licensee and its Affiliates and their respective officers, directors, employees, agents, successors and permitted assigns (singularly or collectively, the "Licensee Indemnified Parties") from and against all Losses resulting from, occurring in connection with, or arising out of (i) any breach of any representation, warranty or covenant on the part of Licensor under the terms hereunder; or (ii) gross negligence or willful misconduct of Licensor and/or any of his Affiliates, employees or agents, including, but not limited to, that resulting in the injury of, or damage to, any person or real or tangible personal property.

9.2   Licensee shall, at its own expense, indemnify, defend and hold harmless Licensor, and its officers, directors, employees, agents, successors and permitted assigns (singularly or collectively, the "Licensor Indemnified Parties") from and against all Losses resulting from, occurring in connection with, or arising out of (i) any breach or alleged breach of any representation, warranty or covenant on the part of Licensee under the terms hereunder; or (ii) the infringement by the Products (or other technologies or other materials provided or used by Licensee), or any business process utilized by employees of Licensee, of any Intellectual Property Rights of a Third Party, except to the extent caused by Licensor or his Affiliates, including, without limitation, by the Licensed Technology. In the event any of the Licensor

Indemnified Parties is named as a defendant in, or is otherwise obligated to defend, any action asserting any claim indemnifiable hereunder, Licensee will assume, at Licensee's expense, the defense of such actions on behalf of such Licensor Indemnified Parties, provided that, to the extent any of the terms of any proposed settlement thereof affects Licensor's rights or obligations arising hereunder, no such terms shall be agreed to without Licensor's consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, and of the Licensor Indemnified Parties shall have the right to file an answer or motion to prevent the entry of a default judgment against it.

9.3     Each of the foregoing party's right to receive indemnification pursuant to this **Section 9** is subject to that party providing prompt written notice of a claim of indemnification to the Party having an obligation to indemnify pursuant to this **Section 9** and providing reasonable assistance requested by such Party in connection with such claim.

9.4     In the event of any claim by a Third Party or Affiliate alleging violation of its Intellectual Property Rights by the Licensed Technology, neither Party shall settle any such claim without the prior written consent of the other, which will not be unreasonably withheld.

10.     **Infringement.**

10.1    Licensee and Licensor agree to promptly notify each other of any suspected infringement of the Licensed Technology by any Third Party (including, for purposes of this **Section 10**, Affiliates). In the event that any legal action against any Third Party is deemed necessary by either Party for the protection of their respective interests in and to the Licensed Technology, the Parties shall cooperate with each other and render all reasonably necessary assistance in connection with any such legal action; provided, however, that neither Party shall settle any such action without the prior written consent of the other, which will not be unreasonably withheld. Within thirty (30) days after notice from Licensor to Licensee of a suspected infringement, or at any time after Licensee discovers a suspected infringement, Licensee shall advise Licensor of whether or not it will prosecute a suit for infringement. If Licensee elects to prosecute such a suit, it may select legal counsel and will bear all legal fees and expenses and all other costs and expenses incurred in connection therewith. Any money recovered after such costs and expenses are reimbursed will be shared as follows: twenty-five percent (25%) to Licensor and seventy-five percent (75%) to Licensee. If Licensee chooses not to prosecute any such suit for infringement, then Licensor may do so after notice to Licensee, in which case Licensor may select legal counsel and will bear all legal fees and expenses and all other costs and expenses incurred in connection therewith. Any money recovered after such costs and expenses are reimbursed will be shared as follows: twenty-five percent (25%) to Licensee and seventy-five percent (75%) to Licensor.

10.2    In the event that any legal action against any Third Party is deemed necessary by either Party for the protection of their respective interests in and to the Licensed Technology, the Parties shall cooperate with each other and render all reasonably necessary assistance in connection with any such legal action; provided, however, that neither Party shall settle any such action without the prior written consent of the other, which will not be unreasonably withheld.

11.     **DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY.**

11.1    EXCEPT FOR THE WARRANTIES EXPRESSLY SET FORTH HEREIN, EACH OF LICENSEE AND LICENSOR MAKES NO WARRANTIES OF ANY KIND, AND EACH EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER IMPLIED OR STATUTORY OR ARISING OUT OF CUSTOM OR COURSE OF DEALING OR USAGE OF OR IN THE TRADE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

11.2 NEITHER LICENSEE NOR LICENSOR SHALL BE LIABLE (REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY ACTION FOR NEGLIGENCE) FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY LOSS OF DATA OR RECORDS, LOST PROFITS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF, OR COULD HAVE FORESEEN, SUCH DAMAGES, EXCEPT THAT THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO ANY LOSSES OR LIABILITY OF A THIRD PARTY (UNDERSTOOD TO BE THE DEFINED TERM SET FORTH IN **SECTION 1.27** HEREIN).

11.3 EXCEPT WITH RESPECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS WITH RESPECT TO THIRD PARTY LIABILITIES, EACH OF LICENSOR'S AND LICENSEE'S AGGREGATE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL NOT EXCEED ONE MILLION DOLLARS ($1,000,000.00).

12. **General Provisions.**

12.1 All dollar amounts are in United States dollars. All fees and charges shall be invoiced and paid in United States dollars.

12.2 Licensee shall keep complete and accurate books and records with respect to the manufacture, assembly, distribution and sale of the Products according to generally accepted accounting principles. Licensor has the right, through an independent accountant retained by and at the sole expense of Licensor, subject to reasonable confidentiality provisions of Licensee, to inspect Licensee's books and records relating to the subject matter of this Agreement once per quarter with respect only to the last sixty (60) month period, during the Term and for a period of five (5) years thereafter, on reasonable notice to Licensee, during regular business hours, at the place where such books and records are normally kept, and to the extent reasonably necessary to determine the accuracy of any Royalty Fees to be paid under this Agreement. Licensee is entitled to rely on the financial reports submitted to it by its Affiliates and sublicensees, and Licensee is not required to verify such reports by actual inspection of its Affiliates' or sublicensees' books and records. However, Licensee shall require its Affiliates and sublicensees to keep complete and accurate books and records with respect to the manufacture, assembly, distribution and sale of the Products according to generally accepted accounting principles and make all said books and records available for review by Licensor through an independent accountant retained by and at the sole expense of Licensor on a quarterly basis in a similar manner and for similar periods as Licensee is required in this **Section 12.2**. Licensee shall make available to Licensor the results of any audit it conducts of its Affiliates or sublicensees to the extent related to the accuracy of any Royalty Fees paid under this Agreement. Licensor shall keep confidential and not disclose to any Person any and all information obtained by Licensor in such inspections and in the royalty reports provided under **Section 4.2**, except in connection with any action to enforce Licensor's rights under this Agreement.

12.3 Notices. Any notices or other communications required or permitted to be given or delivered under this Agreement shall be provided by email (provided that (i) the sender's computer system is capable of retaining and does retain a record establishing that the email message was actually delivered to the recipient's email server, and (ii) that such email is accompanied by a facsimile communication (not requiring telephonic voice confirmation)), or in writing (including facsimile communication), which shall be sufficiently given if delivered personally, mailed by certified first-class United States mail, postage prepaid, or sent via reputable overnight delivery courier or any other means for which a proof of delivery is provided. Notices shall be sent to a Party at its address as set forth below, or to such other address as has been designated by the other Party in accordance with this **Section 12.3**.

Any notice by fax shall be deemed given when telephonic (voice) confirmation of receipt is received, and any other notices shall be deemed given on the date delivered or five (5) days after being placed in the mails as specified.

    For Licensee:

        Failsafe Air Safety Systems Corp.
        79 Fillmore Avenue
        Tonawanda, New York 14150

    with a copy to:

        Kaye Scholer LLP
        Attention: Administrative Partner
        425 Park Avenue
        New York, NY 10022

    For Licensor:

        Theodore A. M. Arts
        312 Countryside Lane
        Williamsville, New York 14221

    12.4    <u>Product Liability Insurance</u>. Promptly after the date hereof, Licensee shall have obtained and maintain in effect during the Term, at its sole cost and expense, all risk product liability insurance in an aggregate amount of not less than One Million Dollars ($1,000,000.00) naming Licensor as an additional insured, and shall promptly provide Licensor with a certificate or certificates evidencing such insurance. Each such insurance policy shall provide for at least thirty (30) days' prior notice to Licensor in the event of any cancellation.

    12.5    <u>Assignment</u>. This Agreement may not be assigned by either Party without the written approval of the other, which shall not be unreasonably withheld; provided, however, Licensee may, notwithstanding the foregoing, assign this Agreement, provided that Licensee remains jointly and severally liable for the performance of the obligations of Licensee and the assignee. This Agreement will be binding and will inure to the benefit of each permitted assignee and each Party's successors.

    12.6    <u>Waiver</u>. The waiver by either Party of a breach of any provisions contained herein will only be effective if in writing and will in no way be construed as a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

    12.7    <u>Severability</u>. In the event that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable or invalid under any applicable law, such unenforceability or invalidity will not render this Agreement unenforceable or invalid as a whole, and, in such event, such provision will be changed and interpreted so as to best accomplish the objectives of such provision within the limits of applicable law or applicable court decisions.

    12.8    <u>Controlling Law</u>. The interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by the laws of the State of New York, United States, without giving effect to any law regarding conflicts of law that would require the application of the law of another jurisdiction.

12.9   Jurisdiction.  Any suit or action of any kind brought to enforce any provision of this Agreement shall be brought in any court of competent jurisdiction in the County of Erie, State of New York, United States.  The Parties consent to personal jurisdiction of and venue in the state and federal courts within that county and hereby irrevocably waive any objections to such jurisdiction, including but not limited to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.  Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the means set out for the giving of notice pursuant to **Section 12.3** of this Agreement.  Nothing herein shall affect the right of any Party hereto to serve process in any other manner permitted by law.

12.10   No Agency.   Nothing contained herein will be construed as creating any agency, employment, franchise, partnership or other form of joint enterprise between the Parties.  Neither Party shall have, or hold itself out as having, the right or authority to assume or create any obligation or responsibility, whether express or implied, on behalf of or in the name of the other, except with the express written consent of the other.

12.11   Counterparts.  This Agreement may be signed in two or more counterparts, all of which taken together shall constitute a single instrument.

12.12   Force Majeure.  Neither Party shall be liable for any default or delay in the performance of its obligations hereunder to the extent such default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature, or Acts of God; acts of war, terrorism, riots, civil disorders, rebellions, or revolutions; strikes, lockouts, or labor difficulties; or any other similar cause beyond the reasonable control of such Party (a "Force Majeure Event").  These delays shall not constitute a breach of this Agreement and the non-performing Party will be excused from any further performance or observance to the obligations so affected by the Force Majeure Event for as long as the Force Majeure Event exists and such Party continues to use its best efforts to recommence performance or observance whenever and to whatever extent possible without delay.  Any Party so delayed in its performance will immediately notify the other Party by telephone (confirmed in writing within two (2) business days (Licensee Business Days in the case of Licensee) of the inception of such delay).

12.13   Further Assurances.  Each Party hereto agrees to cooperate with the other to execute any and all documents or instruments, or to obtain any consents, in order to assign, transfer, perfect, record, maintain, enforce or otherwise carry out the intent and purposes of the terms of this Agreement.

12.14   Entire Agreement; Headings.  This Agreement, including all exhibits and/or schedules attached hereto, completely and exclusively states the agreement of the Parties regarding its subject matter.  It supersedes, and its terms govern, all prior proposals, agreements or other communications between the Parties, oral or written, regarding such subject matter (including, without limitation, the Existing License, other than with respect to amounts due and owing under the Existing License and as set forth in **Section 2**).  Titles and captions are used for convenience of reference only and do not constitute a part of the Agreement or limit, expand or construe its terms.  This Agreement will not be modified except by a subsequently dated written amendment signed on behalf of each Party by its duly authorized representatives.

12.15   Principles of Construction.  All references to this Agreement shall be deemed to include the exhibits, schedules and other attachments.  All references to sections are to the sections herein and all references to exhibits and/or schedules, are to the exhibits and/or schedules which are attached hereto and made a part hereof, as if fully set forth herein.  The words "hereof," "herein" and "hereunder" and words

of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

12.16   Negotiation and Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement (and any applicable or relevant provision) shall be construed as if jointly drafted by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any one Party by virtue of the authorship of any of the provisions of this Agreement.

12.17   Use of Marks.  Licensor may not use any trademarks of Licensee or its Affiliates without the prior express written permission of Licensee.

12.18   Confidentiality.  The provisions of this Agreement will be held in confidence by the Parties and will not be publicly disclosed in any manner whatsoever; provided, however, that (a) each Party may disclose this Agreement in confidence to its attorneys, accountants, auditors, tax preparers, and financial advisors, under similar obligations of confidentiality; (b) Licensee may disclose this Agreement as necessary to fulfill standard or legally required corporate reporting or disclosure requirements; and (c) the Parties may disclose this Agreement insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law.

[signatures appear on following page]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

FAILSAFE AIR SAFETY SYSTEMS CORP.

By:

_____          _____
Name: Theodore A. M. Arts                Name: Paul Chirayath
                                         Title: President

SIGNATURE VERSION

## EXHIBIT A

### Licensed Patents

1.  Licensed Patents.

    U.S. Patent No. 6,162,118.

2.  Applications.

    U.S. Provisional Patent Application No. 60/383,126, filed on May 20, 2002; and

    U.S. Application No. 10/434,041, filed on May 8, 2003.

3.  Invention Disclosures.

    Sensor Controlled Air Decontamination Unit.

    Mini Isolation System (Mask).

    Mini Air Cleaner System.

    Isolation Tent.

    On-the-Go Isolation Unit.

    Environmental Air Scrubber.

    Ultraviolet Cross Linking Aerosol Scavenger Technology.

    Adiabatic Flake Technology.

## EXHIBIT B

### Products

1. All medical devices, currently the model(s) TB 07 and TB 77.

2. All FASS models, currently the FASS 700, FASS 1000, FASS 2000, FASS HAZMAT, and all derivatives and attachments.

3. All LivingAire booth(s), currently model FCS 007, FCS 107, FCS 247, FCS 7000 and all derivatives.

EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                  SUPERIOR COURT
                                              CIVIL ACTION NO.

_____
                              )
BRANDON ASSOCIATES, LLC,      )
     Plaintiff                )
                              )
v.                            )
                              )
FAILSAFE AIR SAFETY SYSTEMS   )
Corp.,                        )
     Defendants               )
                              )
_____)

PRELIMINARY INJUNCTION

After hearing, the Court hereby ENJOINS and RESTRAINS Defendant FAILSAFE AIR SAFETY SYSTEMS Corp. and their agents, servants, employees and attorneys from (a) assigning, selling or otherwise transferring to any party any and all ownership and/or licensing rights or agreements to U.S. Patent No. 6,162,118 and to U.S. Patent Application No. 10/434,041; and (b) fraudulently using Plaintiff's name and Plaintiff's President and CEO Donald B. Flanagan's name in any of Failsafe's literature or publications.

Dated:_____          _____

                                    (_____, J.)

5

## 310 Mass. 618; Garsson v. American Diesel Engine Corp.;

**Page 618**

MURRAY W. GARSSON vs. AMERICAN DIESEL ENGINE CORPORATION & others.

[Cite as Garsson v. American Diesel Engine Corp., 310 Mass. 618]

Middlesex. January 8, 1941.---January 27, 1942.

Present: FIELD, C.J., DONAHUE, COX, & RONAN, JJ.

Damages, For breach of contract. Equity Jurisdiction, To reach and apply equitable assets, Specific performance. Contract, Construction. Equity Pleading and Practice, Appeal, Decree. Words, "Debt."

Upon an appeal from a final decree in a suit in equity, where there had been an order that the evidence be reported but the appellant in writing had waived his right thereunder, stating that he relied on the pleadings and "the documentary evidence," and there was not in the record a report of the evidence or a statement by the trial judge of findings of fact although what purported to be an exhibit, which was not a part of the pleadings, was printed with the record, the only question presented was whether the decree properly could have been entered on the pleadings.

Under a contract requiring the defendant, within a specified time, to give the plaintiff a note payable in instalments, the plaintiff, who had fully performed the contract, upon the defendant's failure so to give the note, acquired a cause of action against him which was for the full amount of the note and was a "debt" of the defendant within G. L. (Ter. Ed.) c. 214, § 3 (7).

A contract between a plaintiff and several defendants requiring the defendants to cause a corporate defendant "to be the owner or exclusive licensee" of certain patents, subject to an existing license granted under one of the patents, until indebtedness of the corporation and another defendant to the plaintiff should be satisfied, and providing that "any royalty paid by" the corporation "to the owners or holders of" the patents should not exceed a specified amount, meant that the defendants had an option either to make the corporation the owner of the patents or to make it exclusive licensee thereof, except that, in the case of the patent already subject to license, the corporation was to be made the owner.

A decree in equity enforcing a contract under which the defendant was required to do one or the other of two acts was erroneous in ordering him to do a specified one of them rather than the one he should choose; the court could not substitute its choice for his.

BILL IN EQUITY, filed in the Superior Court on October 18, 1939.

The case was heard by *Hanify*, J.

**Page 619**

H. G. Crockett, Jr., (F. W. Andres with him,) for the defendants.

E. F. McClennen, (E. Williamson with him,) for the plaintiff.

COX, J. The defendants are American Diesel Engine Corporation, a Massachusetts corporation hereinafter referred to as the corporation, Duplex Diesel Co., Inc., a Massachusetts corporation, and John J. McCarthy of Malden. An agreement under seal was entered into between the three defendants and the plaintiff on September 8, 1939, for the settlement, without litigation, of claims of the plaintiff against the defendants. The defendants agreed to cause all "McCarthy Diesel Engine patents" to be vested in the corporation, either as owner or as exclusive licensee, there to remain until the obligations of the defendants to the plaintiff were paid in full. The corporate defendants agreed to pay the plaintiff $25,000 within thirty days. The corporation agreed to give the plaintiff, within thirty days, its interest bearing note, dated September 8, 1939, for $23,000, "payable semi-annually commencing June 1, 1940 from its net earnings as computed in accordance with accepted accounting principles and before the payment of dividends on any class of stock," and after December 31, 1941, any balance was to be due and payable on demand. In consideration of the foregoing agreements, the plaintiff gave the defendants a general release of all demands.

The defendants made no payment and gave no note as agreed. By the bill, which was filed on October 18, 1939, the plaintiff asked for the establishment of his debt, amounting in all to $48,000, with interest from October 9, 1939, and for the application in payment of his debt of various patents and patent rights of the defendants, which were the subject matter of the agreement between the parties.

1. The defendants appealed from the final decree granting the plaintiff relief. There was an order that the testimony be reported (G. L. [Ter. Ed.] c. 214, § 24). The defendants, however, in writing, waived their rights under this order and therein stated that for the purposes of ap-

Page 620

peal, they rely upon the pleadings and "the documentary evidence." "Exhibit 1" is printed in the record and purports to be a memorandum of agreement made on August 11, 1939, between McCarthy and the corporation relative to certain patents.(fn1) There is no report of the evidence, and no statement of findings of fact was made by the trial judge. The only question presented on this state of the record is whether the decree properly could have been entered on the pleadings. The entry of the decree imports a finding of every fact essential thereto. *Novick* v. *Novick*, 299 Mass. 15. See *Romanausky* v. *Skutulas*, 258 Mass. 190, 194; *Abeloff* v. *Peacard*, 272 Mass. 56, 59; *Yoffa* v. *National Shawmut Bank of Boston*, 288 Mass. 422, 426.

2. The defendants contend that there was error in establishing the debt of the corporation in the sum of $48,000. They concede that there is an indebtedness of $25,000. The answer to this contention depends upon whether the failure of the corporation to give its note to the plaintiff, as promised, amounts to the creation of a "debt" within the meaning of G. L. (Ter. Ed.) c. 214, § 3 (7), by virtue of which, among other things, jurisdiction in equity is given over suits by creditors to reach and apply, in payment of a "debt," certain property and interests of the debtor. The first step in a proceeding of this character is the establishment of an indebtedness of the defendants to the plaintiff, and, in essence, this is an action at common law. *Stock-bridge* v. *Mixer*, 215 Mass. 415, 418. Upon the failure of the corporation to deliver the note, the plaintiff's remedy is for a breach of the contract, *Loring* v. *Gurney*, 5 Pick. 15; *Hunneman* v. *Grafton*, 10 Met. 454, 459, and the amount of his damages is involved. It has been held that where goods are sold to be paid for by a note that is not given, the vendor is entitled to recover as damages the whole value of the goods, unless, perhaps, there should be a rebate of interest during the time of stipulated credit. "The damages are the price of the goods." *Stephenson* v. *Repp*, 47 Ohio St. 551, 554, 555. In a case where the defendant

**Page 621**

promised to give the plaintiff his note for $100 in exchange for the plaintiff's withdrawal of an action against him and failed to give the note, it was held that the plaintiff was entitled to recover the actual damage sustained, "one hundred dollars, which the defendant promised to pay." *Stoddard* v. *Mix*, 14 Conn. 12, 24. *Thomas Manuf. Co.* v. *Watson*, 85 Maine, 300, 301. In some cases it has been said that in an action for a breach of an agreement to execute and deliver a promissory note, the amount for which the note was to be given will be the prima facie measure of the damages. *Standard Lumber Co.* v. *Deer Park Lumber Co.* 104 Wash. 84, 98. *Wasser* v. *Western Land Securities Co.* 97 Minn. 460, 466. See *Kennedy* v. *Hudson*, 224 Ala. 17, 21; *Bowman* v. *Branson*, 111 Mo. 343, 362.

In the case of *Woodbury* v. *Sparrell Print*, 187 Mass. 426, 428, 429, it was said that the word "debt," as appearing in the statute that was the predecessor of G. L. (Ter. Ed.) c. 214, § 3 (7), was used in its broad sense, and it was held that a claim for loss of rent under a covenant in a lease was a debt within the meaning of the statute. After the decision in that case and the amendment of the statute in question in another particular, it was held in the case of *H. G. Kilbourne Co.* v. *Standard Stamp Affixer Co.* 216 Mass. 118, that the word "debt" in the statute as amended did not include all actions founded upon a contractual liability, but included only debts as distinguished from mere claims for damages. In that case the *Woodbury* case is considered at length, and it is said that there is nothing in that decision or in the reasoning of the opinion to warrant the extension of the statute to the breach of an executory contract involving wholly unliquidated damages. It was said, however, that the word "debt," as appearing in the statute, is to be construed broadly rather than narrowly, and that it may comprehend not only liquidated demands where there is an express or implied promise to pay or an absolute duty raised by law to discharge, but also an agreement for the payment of money which will require some calculation or determination of extraneous facts before its exact amount can be ascertained, provided the debtor has made a dis-

**Page 622**

tinct and binding promise to pay. *Stone, Timlow & Co. Inc.* v. *Stryker*, 230 Mass. 67, 72.

In the case at bar there was no express promise to pay. On the contrary, the promise was to give a note. We think that in an action for failure to keep such a promise, the damages would be the amount of the note. In the agreement of the parties the plaintiff released and discharged the defendants from all claims. We think that, by this agreement, it was within the contemplation of the parties that the plaintiff was to receive $48,000 for his release, to be paid, it is true, in two particular ways, $25,000 in cash and $23,000 by a note. There is an implication that the corporation, when it promised to give the note, must have expected that it would have to pay $23,000. It was said in *Stoddard* v. *Mix*, 14 Conn. 12, 24, hereinbefore referred to, that the plaintiff could have no other action than upon the special contract, and that at some time he was entitled to recover the actual damage sustained, "one hundred dollars [the amount of the note that was to be given], which the defendant promised to pay." In the case of *Kimpton* v. *Bronson*, 45 Barb. S. C. 618, 625, cited with approval in the *Kilbourne* case, it is said that the word "debt" has been differently defined, owing to the subject matter of the statutes in which it has been used. "Ordinarily, it imports a sum of money arising upon a contract express or implied ... In its more general sense it is defined to be that which is due from one person to another, whether money, goods or services; that which one person is bound to pay or perform to another."

The general rule stated in the *Kilbourne* case has been referred to and followed. See *Stone, Timlow & Co. Inc.* v. *Stryker*, 230 Mass. 67, 72; *Williamson* v. *Williamson*, 246 Mass. 270, 273; *Bethlehem*

*Fabricators, Inc.* v. *H. D. Watts Co.* 286 Mass. 556, 563. In the case of *Kirby* v. *Donovan*, 228 Mass. 86, 89, decided about four years after the decision in the *Kilbourne* case, Loring, J., who was a member of the quorum in the *Kilbourne* case, said that in that case it was decided that a bill to reach and apply does not lie to enforce a claim for breach of a contract where the dam-

### Page 623

ages are unliquidated. The court, in discussing the meaning of the word "debt," as used in other statutes, has had occasion to refer to that word as having a more "constricted significance" as used in the statute involved in the case at bar. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 247 Mass. 334, 341. *Union Market National Bank of Watertown* v. *Gardiner*, 276 Mass. 490, 495.

We are of opinion that the damages for the breach of the contract to give the note in the case at bar can be said to be liquidated within the definition of liquidated damages announced by Rugg, C.J., in *Cochrane* v. *Forbes*, 267 Mass. 417, 420, 421. It is to be observed that that case (decisions in which are also reported in 257 Mass. 135 and 265 Mass. 249) was a bill to reach and apply in payment of a debt, shares of stock owned by the defendants. In that case, the plaintiffs had paid the alleged debtors in advance for oil that had not been delivered. We are of opinion that there was no error in establishing the debt of the corporation in the sum of $48,000.

3. By the terms of the agreement, annexed to and made a part of the plaintiff's bill, the defendants warrant that they will cause the corporation to be the "owner or exclusive licensee" of all "McCarthy Diesel Engine patents" now issued or pending, subject to an existing license to Hug Motor Car Company; that said patents shall not be transferred, assigned or sold until the obligations to the plaintiff are paid in full; and that any royalties paid by the corporation to the "owners or holders of said McCarthy patents" shall not exceed five per cent of the sales price. The decree orders the defendants to perform the warranty by executing separate assignments of each of said patents and patent rights, and all options and licenses and rights to the corporation, subject to the existing license to Hug Motor Car Company, and subject to the provision as to the limitation of royalties to be paid, and recites that the corporation has an option to acquire the interest of McCarthy in that license. The decree further provides that if $48,000 with interest is not paid as ordered, the letters patent, licenses and options shall be delivered to a special master and sold

### Page 624

by him at public auction, and the master is empowered to execute in the name of each of the defendants any and all assignments, licenses, options or other documents "proper to carry out the purposes of this decree, and to vest in the purchaser at any such auction sale, title to the property sold thereat." It is further provided that the defendants shall execute separate assignments in proper form for recording in the respective patent offices from which said patents have issued or in which applications therefor are pending, and shall forthwith deliver said assignments to the special master.

The bill alleges that the corporation is the owner of certain patents and patent rights commonly described as the "McCarthy patents or the McCarthy Diesel Engine patents"; that said patents and the rights therein stand "to some extent" in the names of the corporation, Duplex Diesel Co., Inc., and McCarthy, and that under the terms of the agreement of the parties, they are, at law and in equity, the property of the corporation, and that the plaintiff is ignorant "as to which in said three names" the respective patents and rights stand. Certain patents are listed in the bill as "Among said patents." The decree recites that McCarthy is in law the owner of certain patents therein listed. The decree then

provides for the assignment to the corporation of all "McCarthy Diesel engine patents" and of all options and licenses and rights, as hereinbefore set out.

The defendants contend that the agreement between the parties gave them the option of causing the corporation to be either the owner or the exclusive licensee of the patents in question subject to an existing license, and that the decree is in error in ordering assignments. It is to be observed that the decree requires assignments of the patents and other rights in disregard of the option as to licensing. The defendants contend that by the terms of "Exhibit 1," appearing in the record, McCarthy, on August 11, 1939, prior to the time when the agreement between the parties to this suit was made, that is, on September 8, 1939, had already constituted the corporation the licensee of the pat-

**Page 625**

ents in question, and that the decree, in any event, is in error in that it takes away McCarthy's right to make the corporation the owner or exclusive licensee. But in the absence of a report of all the evidence, we cannot put ourselves in the position of the trial judge. It is true that the agreement between the parties provided that any royalty paid by the corporation shall not exceed five per cent of the sales price, and this seems to indicate that this royalty would be paid by the corporation as a licensee. Obviously, if it were the owner of the patents, it would not be paying any royalty. The decree also contains this provision as to "any royalty paid by American Diesel Engine Corporation." This provision appears to be inconsistent with the other provisions in the same paragraph where it appears, requiring separate assignments of all patents and other rights. An assignment of a patent differs materially from a license to use the invention. *Standard Button Fastening Co.* v. *Ellis*, 159 Mass. 448, 449. *Burton* v. *Burton Stock Car Co.* 171 Mass. 437, 439. *Good* v. *Daland*, 121 N. Y. 1, 8. The undertaking of the defendants either to assign or to license is different from a mere option that a party may have, as, for example, to purchase something. See *Conos* v. *Sullivan*, 250 Mass. 376; *Dooley* v. *Resnik*, 256 Mass. 205, 209; *Kelley* v. *Ryder*, 276 Mass. 24. In the case at bar, however, the obligation of the defendants is to do one thing or the other. The court cannot substitute its choice for that of the defendants who have that right. It seems obvious that one cannot be made an exclusive licensee subject to an existing license. *Agnew* v. *Kelsey Wheel Co.* 185 Mich. 340, 348. It is obvious that if the corporation was made the owner of the patent under which Hug Motor Car Company is already a licensee, there would be no royalty to be paid by the corporation. If it were not for the provision in the decree as to any royalty paid by the corporation, the problem would be presented in a different light. But this provision as to the payment of royalty seems to recognize the existence or creation of licenses, the option to give which was provided for in the agreement between the parties.

We are of opinion, accordingly, that the most that can

**Page 626**

be required of the defendants is an assignment of such patents as are now subject to an existing license to Hug Motor Car Company and also an order that the defendants cause the corporation to be either the owner or the exclusive licensee of all other "McCarthy Diesel engine patents," and that if licenses are given, the royalty to be paid shall not exceed five per cent of the sales price. We assume that this reference to "sales price" in the agreement, as well as in the decree, is to the sale of articles that may be manufactured under licenses. The decree should be modified accordingly not only as to the matter of assignment and licensing, but also so as to provide that it is the licenses and the assignment of the patent, now subject to the license to Hug Motor Car Company, that are to be sold. The decree should also contain a provision that McCarthy's rights to a royalty of not more than five per cent are preserved.

The defendants make no contention that their interests, as provided for in the agreement between the parties, cannot be reached and applied in satisfaction of the plaintiff's debt.

The decree as modified in accordance with this opinion is affirmed.

*Ordered accordingly.*

---

Footnotes:

1 Exhibit 1 is not a part of the pleadings.---REPORTER.

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.